UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| UNITED STATES OF AMERICA, | Case No. 1:18-cr-00214-DCN |
|---|---|
| Plaintiff, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| SETH ANTHONY JOHNSON, | |
| Defendant. | |

## I. INTRODUCTION

Pending before the Court is the matter of Defendant Seth Johnson's alleged contempt for willfully disobeying an existing Court order. After issuing an Order to Show Cause (Dkt. 154) and a Notice of Criminal Contempt (Dkt. 163), the Court held oral argument on May 26, 2021, and took this matter under advisement. Upon review, and for the reasons set forth below, the Court finds Johnson in contempt for violating its prior order and imposes a fine of $5,000.

## II. BACKGROUND

On July 7, 2018, the Government filed an indictment against Johnson. Dkt. 1. On October 18, 2019—after a three-day trial—a jury returned a guilty verdict on all three counts set forth in the indictment. Dkt. 91.

Prior to sentencing, the Government filed an Ex Parte Application for Pre-Judgment Writs of Attachment and Garnishment on December 31, 2019. Dkt. 99. In its application,

the Government explained that Johnson had recently assigned a power of attorney to one of his friends—Michael Dye—and had instructed Dye to gather his personal assets and sell them. Dkt. 99, at 4. The Court granted the Government's application. Dkts. 100, 101. Johnson subsequently filed a motion to dissolve the writs. Dkt. 106. The Court held a hearing and, ultimately, on February 10, 2020, granted Johnson's motion and dissolved the writs. Dkt. 117. The Court, however, concurrently issued an order freezing Johnson's assets pending sentencing. Dkt. 118. The Court's concern was that Johnson appeared to be transferring and disposing of assets in an effort to avoid his likely restitution obligations. *Id*. at 4. In order to preserve any potential restitution funds, the Court ordered Johnson, pursuant to the All Writs Act, not to dispose of any asset greater than $100 without Court permission. *Id*. The Court also instructed the United States Marshals Service to retain two of Johnson's vehicle titles it had already confiscated. *Id.*

In its decision, the Court observed that such a course of action was somewhat drastic, but explained that Johnson's evasive behavior would likely ruin any opportunity for the victim in this case to receive restitution. Additionally, the Court noted that because Johnson was facing the likelihood of a lengthy prison sentence, he "would have no reason to obey the Court's freezing of his assets absent potential sanctions." *Id*. at 4, n.2. As will be explained below, this observation proved to be prophetic.

At the outset of the sentencing hearing on February 21, 2020, the Court sua sponte brought up its concern that Johnson may have violated its prior order freezing his assets by instructing Dye to sell one or more of his vehicles. The Court then stated its preference to have a show cause hearing on this matter "the same date as any restitution hearing." Dkt.

139, at 2. When Johnson asked to address the Court on that topic, the Court stated that it was "not going to address it today. I'm just bringing it up. When we have a restitution hearing, that's when I'll address it, and that's when you can explain it to me." *Id.* at 3. The Court then pointed out its specific concern (regarding the sale/transfer of a vehicle) and stated, again, that, "at the restitution hearing, you're going to have to give me evidence of when the vehicle was transferred or testimony, whatever." *Id.* The Court ultimately sentenced Johnson to 720 months imprisonment. Dkts. 125, 126.

Thereafter, COVID-19 took center stage. In light of COVID-19—and for other reasons explained in the Court's order on restitution (*see* Dkt. 158, at 5)—over one year elapsed before the Court was able to hold a hearing on restitution. At that hearing, the Court and counsel informally discussed the fact that while the Court originally intended to proceed with some type of "show cause" hearing related to Johnson's alleged contempt (in conjunction with the hearing on restitution), it seemed procedurally proper to hold the hearings separately. The Court and counsel discussed various procedural aspects of the situation and the Court requested that the Government file a notice outlining Johnson's purported conduct. The Government obliged. Dkt. 148. The Court then issued a notice ordering Johnson to "appear and show cause why he should not be held in contempt for failure to comply with the Court's prior orders regarding the sale of assets." Dkt. 154. The Court set a hearing for May 12, 2021. *Id.*

On May 12, 2021, the Court and counsel again informally discussed the best way to proceed with the day's hearing. Johnson's attorney argued that under Federal Rule of Criminal Procedure 42, he did not believe his client had been provided adequate notice of

the charge against him. Various other procedural aspects of the case were also discussed. Ultimately, the parties (and the Court) agreed that additional time was necessary to ensure all could research the proper procedures and prepare accordingly. *See* Dkt. 161.

The Government subsequently filed a Criminal Contempt Memorandum. Dkt. 160. The Court reviewed those allegations and facts and, in accordance with Federal Rule of Criminal Procedure 42, issued a Notice of Criminal Contempt (Dkt. 163) apprising Johnson of the "essential facts constituting the charged criminal contempt." Fed. R. Crim. P. 42(a)(1)(C).

At long last, the Court held a contempt hearing on May 26, 2021. Dkt. 168

### III. LEGAL STANDARD

"Criminal contempt is established when there is a clear and definite order of the court, the contemnor knows of the order, and the contemnor willfully disobeys the order." *United States v. Powers*, 629 F.2d 619, 627 (9th Cir.1980). "[A]ctual knowledge of the order is all that is required; neither formal notice nor personal service is necessary to support a conviction for criminal contempt." *United States v. Rylander*, 714 F.2d 996, 1003 (9th Cir. 1983).

A criminal contempt sanction both vindicates the court's authority and punishes the contemnor. *United States v. Doe*, 125 F.3d 1249, 1256 (9th Cir.1997). In fashioning an appropriate sanction for contempt, district courts have wide discretion. *See also Frank v. United States*, 395 U.S. 147, 149 (1969) ("[A] person may be found in contempt of court for a great many different types of offenses . . . . Congress, perhaps in recognition of the scope of criminal contempt, has authorized courts to impose penalties but has not placed

any specific limits on their discretion.").

## IV. DISCUSSION

As numerous scholars have noted, nothing vexes courts quite like contempt proceedings. *See, e.g.,* Dudley, *Getting Beyond the Civil/Criminal Distinction: A New Approach to the Regulation of Indirect Contempt*, 79 Va. L. Rev. 1025, 1033 (1993) (describing the distinction between civil and criminal contempt as "conceptually unclear and exceedingly difficult to apply"); Martineau, *Contempt of Court: Eliminating the Confusion between Civil and Criminal Contempt*, 50 U. Cin. L. Rev. 677 (1981) ("Few legal concepts have bedeviled courts, judges, lawyers and legal commentators more than contempt of court."). While the Court has endeavored to parse through these difficult questions and to ensure Johnson was afforded all procedural safeguards, he has raised two concerns that must be addressed at the outset: (1) the adequacy of contempt notice, and (2) the validity of the Court's underlying order. Following these discussions, the Court will review the merits of the contempt allegation itself.

**A. Notice**

As noted, on multiple occasions, the Court and counsel discussed (both on and off the record) the difficulties of contempt proceedings and how best to proceed in this case. And despite various continuances and efforts made to ensure all procedures were followed, Johnson still contends that the Court's notice was insufficient for purposes of Federal Rule of Criminal Procedure 42[1] and argues this matter should be dismissed outright. The Court

---

[1] Rule 42 outlines that a court must provide notice to any person accused of criminal contempt. The notice must: (1) state the time and place of the contempt hearing; (2) allow the defendant time to prepare a defense;

disagrees. While its original show cause notice (Dkt. 154) was scant on details, it was based on the Government's memorandum which outlined the salient facts. *See* Dkt. 148, at 6. The Court assumes, however, without formally deciding, that its original notice *did not* satisfy Rule 42.

That said, the Court's second notice did comply with Rule 42. Dkt. 163. Therein, the Court outlined its prior order, noted that the Government had presented evidence to suggest Johnson violated said order, and ordered Johnson to appear and show cause why he should not be held in contempt. Specifically, the Court stated the hearing was for a "charge of criminal contempt for disposing of his personal property, including [] vehicles . . . in violation of the Court's order freezing all his assets." *Id*. at 2. Again, the underlying documents (Dkts. 148, 160) outlined in greater detail the facts upon which the Government intended to rely when asserting that Johnson violated the Court's order. It can, therefore, hardly be said that Johnson did not know what facts were at issue or what he was being accused of. *See Powers*, 629 F.2d at 625 ("Simple notice is all that is required. The purpose of notice is to inform the contemnor of the nature of the charge and enable the contemnor to prepare a defense."). In short, the Court finds its notice was sufficient under Rule 42.

**B. Validity of Underlying Order**

Johnson's second concern is actually a reoccurring argument that the Court's reliance on a particular case in its prior freeze order, *United States v. Gates,* 777 F. Supp. 1294 (E.D. Va. 1991), was misplaced. Because of this purported erroneous holding,

---

and (3) state the essential facts constituting the charged criminal contempt. Fed. R. Crim. P. 42(a)(1)(A)-(C). Johnson has only alleged that the Court's notices failed to comply with the third prong—apprising him of facts surrounding the charge against him.

Johnson contends the order itself is invalid and, therefore, he did not need to abide by its terms.

In its order freezing Johnson's assets, the Court began by noting "[t]he All Writs Act outlines that the Court 'may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.' 28 U.S.C. § 1651(a)." Dkt. 118, at 2. The Court went on to find that it could invoke the All Writs Act to "preemptively stop a person from disposing of assets prior to sentencing." *Id*. The Court cited to *Gates* in support of this conclusion. Johnson has subsequently argued *Gates* is distinguishable from this case because when the Court in *Gates* froze the defendant's assets, the matter of restitution had been settled, whereas here, restitution was still undecided. This is partially true.

In *Gates*, the Court stated that "relief, that is judgment, . . . was not speculative in the instant case." *Id*. at 1295. The Court went on, however, to say that it elected to freeze the defendant's assets to ensure "that assets available at the time of conviction would remain so until sentencing, so that the court could properly assess costs and fines . . . ." *Id*. Johnson argues that the Court's reasoning in its order freezing his assets in this case is flawed because the Court had not already determined that restitution would even be ordered and, thus, reliance on *Gates* was misplaced and there was no reason to freeze his assets.

The Court does not read *Gates* so narrowly. Johnson's argument that *Gates* requires restitution (or any monetary obligation) be firmly decided prior to freezing a parties' assets is belied by the *Gates'* court's language that it chose to freeze the defendant's assets so they would be available at sentencing when the court would "properly assess" any fines or

costs. *Id.* This language appears to indicate a final amount does not need to be established before freezing assets. To be sure, even assuming this was the standard, *as the Court noted in the order itself,* the analysis found in *Gates* is not binding on this Court. It is simply persuasive. The Court cited four other cases to support its conclusion that the All Writs Act authorized it to freeze Johnson's assets to ensure the availability of funds for restitution. Critically, the Court did not rely solely on *Gates* in making its determination that freezing Johnson's assets was appropriate; it relied on the All Writs Act (and supporting interpretations from cases throughout the United States) to freeze Johnson's assets.

However, even assuming arguendo that the Court was incorrect in its analysis of the All Writs Act, or its ability to freeze Johnson's assets pending sentencing and restitution, the outcome would not change. As the Supreme Court noted many years ago, "in the fair administration of justice no man can be judge in his own case, . . . respect for judicial process is a small price to pay for the civilizing hand of law." *Walker v. City of Birmingham*, 388 U.S. 307, 320–21 (1967). In *Walker*, the Supreme Court held "an injunction duly issuing out of a court of general jurisdiction . . . must be obeyed . . . however erroneous the action of the court may be . . . ." *Id*. at 314. The Ninth Circuit has, in turn, relied on *Walker* in rejecting claims by petitioners challenging the underlying constitutionality of court orders that lead to contempt orders. *See, e.g., In Re Establishment Inspection of Hern Iron Works,* 881 F.2d 722 (9th Cir.1989). In *Hern Iron Works,* a petitioner challenged a contempt order because it was based upon an invalid search warrant. The Ninth Circuit held, however, that judicial order could be "enforced through criminal contempt even though the underlying decision may be incorrect and even

unconstitutional." *Id.* at 725. Citing *Walker,* the *Hern Iron Works* court recognized that "the Supreme Court came down on the side of the orderly rule of law." *Id.* at 726. *See also Sparks v. City & Cty. of San Francisco*, 956 F.2d 1168, at *2 (9th Cir. 1992) (unpubl.) (recognizing that the Ninth Circuit "relies on *Walker* in rejecting claims to review the underlying constitutionality of court orders leading to contempt orders").

In short, even if the Court's order freezing Johnson's assets was flawed (or even unconstitutional) it would not absolve him of his duty to abide by it. The Court's prior reliance on *Gates* is, frankly, irrelevant to Johnson's continuing obligation to follow the Court's order.

**C. Contempt**

The Court moves next to the actual allegations of contempt. The Government contends that Johnson committed contempt after February 10, 2020, by directing his power of attorney, Dye, to sell his 2004 Mustang and an RV titled in Johnson's name in direct violation of the Court's order.

The Government has outlined the facts supporting its argument and Dye's testimony at the recent hearing confirmed the Government's suspicions. In short, Johnson willfully violated the Court's order by directing Dye to sell two vehicles. There are email communications (Dkt. 148, at 4) and recorded jail phone calls (Exhibits 1–4) that make such a conclusion inevitable. The Court could review all of these facts, however, there is little need to do so because Johnson himself admitted he violated the Court's order during the show cause hearing. And while the Court will not detail the underlying facts, it does wish to briefly point out the bold and brazen nature of Johnson's contempt.

Specifically, in a recorded jail call between Johnson and Dye on April 13, 2021, Dye expressed concern that the Court was trying to "get [Johnson] for breach of contract for selling the RV and the mustang," to which Johnson replied, "Ya, they're trying to hold me in contempt, but they can't. But ya, I'm not worried about that . . . ya, I don't, I don't care [inaudible] no f*cks to give." Exhibit 4, at 1:47. And, in a subsequent call on April 21, 2021, after coaching Dye that he should tell the Court that the money from the vehicle sales went to pay bills and/or was placed on Johnson's inmate account, Johnson referenced the Court's efforts to hold him in contempt and concluded by saying, "anyway, I don't care as long as my bills got paid, f*ck em . . . they can go to hell." Exhibit 5, at 4:26.

This is the quintessential definition of contempt. It is clear from these conversations that Johnson knew about the Court's order, knew he was subject to it, and knew his behavior directly contradicted the order. Johnson's total and complete disrespect and disregard for the Court's prior order freezing his assets is, frankly, astounding.

Now, Johnson explained at the hearing that he had to sell the mustang and the RV because the sale price was too good to pass up and that he meant no disrespect to the Court in doing so. He acknowledged violating the Court's order but reiterated that he did not do so out of animosity or insolence to the Court, but necessity to get a good price on the vehicles. He reiterated that if he had wanted to disrespect the Court, he would have simply sold the vehicles for $99 each—thus taking the sale outside of the Court's prior freeze order and further thwarting restitution efforts. The Court appreciates Johnson's honest explanation; however, it is cold comfort to the Court.

Regardless of Johnson's purported reason for his behavior, he nonetheless violated

the Court's order. Period. That the manner in which he violated the order was "less disrespectful" than other alternatives is of no import. Ultimately, Johnson's brazen behavior illustrates a complete lack of respect for the Court's order and a finding of contempt is all but mandatory. Court orders must be followed in order to ensure the integrity of the judicial system and Johnson's willful disobedience cannot go unpunished.

The Court next addresses the proper penalty for Johnson's contempt.

**D. Punishment**

The Government has requested a fine of $4,950 for Johnson's contempt. It selected this particular amount for three primary reasons. First, the Government recognized that because Johnson is serving a 60-year sentence, additional prison time would likely not affect Johnson's behavior. However, it is clear that money is a motivating influence in Johnson's life (and the violation here was for monetary gain) so the Government believes a monetary penalty would have some impact on Johnson. Second, a fine in the neighborhood of $5,000 would equate to roughly the sale proceeds from the Mustang Johnson disposed of in violation of the Court's order. Third, and finally, the Government appears to request this specific amount because it believes it would be considered "petty" and, as such, would not implicate Johnson's right to a jury trial. This leads the Court to another vexing question in the world of contempt.

Criminal contempt is "a crime in the ordinary sense" and the same general protections the Constitution requires of any criminal proceeding (notice, the right to counsel, the right to present a defense etc) apply to criminal contempt proceedings. *See Muniz v. Hoffman*, 422 U.S. 454, 475-76 (1975). For "serious" criminal contempt involving

the potential of imprisonment for more than six months, these protections include the right to jury trial. *Bloom v. State of Ill.*, 391 U.S. 194, 196 (1968); *Frank v. United States*, 395 U.S. 147, 149 (1969). *See also*, Fed. R. Crim. P. 42(a)(3). Additionally, if the Court imposes a "substantial fine," a Defendant's right to a jury *might* also attach.[2]

The Government has argued in this case that Johnson's conduct is analogues to 18 U.S.C. § 1509—obstruction of court orders—and that under 18 U.S.C. § 19 and 18 U.S.C. § 3571(b)(7), his offense should be considered "petty," his right to a jury trial has *not* attached, and a fine under $5,000 would be appropriate.

To begin, the Court has already determined a jury trial is not necessary under these circumstances. Dkt. 163, at 2. Second, although Defense Counsel brought up this concept during one of the Court's *informal* conferences, he never raised any objection to the proceedings (other than the matter of notice discussed above) and has thus waived any such argument.[3]

Regardless of Johnson's waiver of the "jury trial" issue, the Court wishes to make clear that it views Johnson's contempt as petty in nature and inadequate under prevailing caselaw to necessitate a jury trial. Johnson's contempt was "serious" in that it was willful, brazen, and a direct afront to the Court's authority, but ultimately his selling of two vehicles in violation of the Court's freeze order does not rise to the level implicating his Sixth Amendment right to a jury. Additionally, while the Supreme Court has not "specified what

---

[2] As explained below, the Supreme Court has not definitively addressed this issue.

[3] To be sure, Johnson has argued against a substantial fine in this case. However, he did so not because he would otherwise be entitled to a jury trial, but because he is facing substantial prison time and will not have any meaningful source of income to pay a fine.

magnitude of contempt fine may constitute a serious criminal sanction"—and thus require a jury trial—it has suggested, without deciding, that as long as the penalty does not "exceed imprisonment for a period of six months or a fine of not more than $5,000 for an individual and $10,000 for a person other than an individual" it is petty and does not require a jury trial. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 837 n.5 (1994).

There are additional cases indicating that the Court should take into account the financial resources of the contemnor when determining whether the prospective punishment requires a jury because an amount that could be considered a serious or substantial fine for one party might be insignificant for another. *United States v. Twentieth Century Fox Film Corp.*, 882 F.2d 656, 665 (2d Cir. 1989) (holding $100,000 fine against organization triggered right to jury trial and below that level court should consider whether fine would have "significant financial impact" on the organization or individual). While the Court is cognizant of these considerations, they do not play a large role in the decision today because they cannot. First, Johnson refused to comply with 18 U.S.C. § 3664(d)(3) and file an affidavit outlining his financial resources in this case. Second, United States Deputy Marshal Pete Thompson testified previously in this case that Johnson has, on occasion, directed Dye (and/or others), to deposit money in other inmates' trust accounts for his benefit. Johnson has undoubtedly done this so that he has funds available to him, but which are out of the Court's grasp. In short, the Court has no idea what Johnson's financial situation is and whether a $5,000 fine would be substantial or not. However, any concern on this topic is outweighed by Johnson's repeated attempts to hide money from the Court and/or his efforts to dispose of assets to avoid restitution or other lawful Court

orders. And again, because the Court has concluded that Johnson's contempt was petty in nature, a fine of $5,000 or less is consistent with similar cases and does not implicate a jury regardless of his financial situation.

Weighing all of the evidence, the Court finds that a fine in the amount of $5,000 is appropriate in this case. Johnson's deliberate disobedience of the Court's order cannot go unpunished. The reason the Court froze Johnson's assets was to preserve them in the event it ordered restitution. The Court did ultimately order restitution. The Court's comment that without the freeze—and the threat of sanctions for failure to comply—Johnson would continue his antics in an effort to frustrate the Court, its orders, and the victim in this case, has come to fruition.[4]

In sum, Johnson deliberately disobeyed a prior Court order he knew he was subject to and a finding of criminal contempt is warranted in this case.

## V. ORDER

1. The Court finds Johnson guilty of contempt for violating its prior order (Dkt. 118) and will impose a $5,000 fine for his conduct. This amount is due and payable immediately in one lump sum.

---

[4] Lest some of the finer details of Johnson's actions get lost in the overall decision today, the Court notes that Dye testified Johnson directed him to use the bulk of the proceeds from the sale of the RV to pay off debts Johnson owed. To that end, Dye paid off roughly $4,000 in debts and then transferred the remaining $1,500 to Johnson's inmate account. Thus, Johnson has already thwarted the Court's efforts to preserve Johnson's assets in order to use their proceeds for restitution and instead used them for his own selfish purposes. What's more, the United States Marshals Service had already confiscated title to both of the Mustang and the RV which means that Johnson (via Dye) either 1) sold the vehicles without a title or 2) went around the Court's order and applied for, and received, new titles for the vehicles. Either way, this further demonstrates Johnson's lack of respect for the Court (and the legal system in general) as well as his selfish, dishonest, and criminal behavior.

2. The fine the Court has imposed *shall be second in priority* to its prior order of restitution in this case. *See* Dkt. 158. It is the Court's understanding that the Warden at Johnson's facility may have intercepted some of Johnson's funds over the past year. Those funds should immediately be used to begin satisfaction of the Court's restitution order. The United States Attorney's Office – Financial Litigation Unit should work with the United States Marshal Service and use any and all means available to effectuate compliance with the Court's prior restitution order and provide compensation to the victim in this case.[5] Once that amount has been satisfied, the $5,000 fine will be collected and payable to the Clerk of the Court.[6]

DATED: June 21, 2021

David C. Nye
Chief U.S. District Court Judge

---

[5] To wit, the Government recently filed a Motion to Order Payment from Inmate Trust Account (Dkt. 170) in order to begin satisfaction of the Court's restitution order.

[6] For the parties' information, the Court intends to donate the $5,000 (or any amount it receives) to the Federal Crime Victims Fund.